LORNE GREENE AND NANCY GREENE, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14750–79.    Filed August 23, 1983.

*Eugene D. Silverman* and *Morris Engel*, for the petitioners.
*Marshall W. Taylor*, for the respondent.

## OPINION

SIMPSON, *Judge*: This matter is before the Court on the
parties' cross motions for partial summary judgment pursuant
to Rule 121, Tax Court Rules of Practice and Procedure.[1] The
sole issue raised by the motions is whether Alpha Film Co.
(Alpha) is entitled to a depreciation deduction for 1975 under
the income forecast method.

The Commissioner determined a deficiency of $9,195 in the
petitioners' Federal income tax for 1975. The deficiency
resulted from the disallowance of the depreciation deduction
claimed by Alpha and from certain other adjustments not now
before us. The petitioners, Lorne and Nancy Greene, husband
and wife, resided in Los Angeles, Calif., at the time they filed
their petition with this Court seeking a redetermination of
such deficiency. They filed their joint Federal income tax
return for 1975 with the Internal Revenue Service Center in
Fresno, Calif. Mr. Greene will sometimes be referred to as the
petitioner.

---

[1]Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

In 1975, the petitioner was a limited partner of Alpha, a New York partnership. Alpha was organized in 1972 for the stated purpose of purchasing the sole and exclusive right to exhibit, distribute, and otherwise exploit the motion picture "Ten Days' Wonder" (the film) in the United States, portions of Canada, and certain other limited areas of the world. The partnership purchased the film from Les Films La Boetie, the French owner of the film, in 1972 for a stated price of $2,250,000.[2]

After purchasing the film, Alpha entered into a distribution agreement with Levitt-Pickman Film Corp. (Levitt-Pickman). The agreement granted Levitt-Pickman "each and every right, license and privilege with reference to the Picture and the exploitation thereof" for a period of 10 years in the territory purchased by Alpha, with certain minor exceptions. In return for distributing the film, Levitt-Pickman was to receive a distribution fee of 30 percent of the gross receipts from the theatrical exhibition of the film. Additionally, Levitt-Pickman was to be reimbursed for certain distribution expenses.

The distribution agreement further provided that Levitt-Pickman was to deposit all gross receipts which it received from exhibitors into a bank account to be opened by Alpha, entitled the "Ten Days' Wonder Special Account" (special account). Withdrawals could be made from this account only over the joint signatures of representatives of both Alpha and Levitt-Pickman. Insofar as is relevant, the distribution agreement provided that until the gross receipts exceeded $1 million and the net receipts[3] exceeded $625,000, the gross receipts were to be withdrawn from the account and distributed according to the following order of priority:

(1) To Levitt-Pickman for unrecouped distribution expenses;
(2) Balance, if any, to Levitt-Pickman for distribution fees;
(3) Remaining balance, if any, to Alpha.

---

[2]The purchase price was paid with cash of $250,000 and delivery of a $2 million nonrecourse promissory note, payable 10 years from closing, at an interest rate of 4 percent per annum.

[3]For this purpose, the net receipts were defined as "the balance of Gross Receipts remaining, after deducting all local cooperative advertising costs incurred in connection with the Picture therefrom."

Levitt-Pickman began distributing the film in 1972. It premiered in several major cities and, over the next few years, was exhibited in more than 100 motion picture theatres in 76 cities throughout the country. Pursuant to the distribution agreement, Levitt-Pickman deposited in the special account the gross receipts as they were received from the theatres for the exhibition of the film. In 1972, Levitt-Pickman incurred reimbursable distribution expenses of $104,091.83, and by the end of 1973, such expenses totaled $111,578.[4]

For 1972 through 1976, Alpha filed returns on a calendar year basis and used the cash method of accounting. On such returns, the following amounts were reported:

| Item | 1972 | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|---|
| Gross receipts | $34,901 | $16,006 | $2,920 | $6,049 | $902 |
| Distribution expenses | 34,901 | 16,006 | 2,920 | 6,049 | 902 |
| Other expenses | 9,442 | --- | --- | --- | --- |
| Depreciation | 1,358,458 | 480,043 | 51,458 | 146,653 | 7,719 |

Because the gross receipts for 1972 through 1976 totaled $60,778, Levitt-Pickman was reimbursed over such years for only that amount of its distribution expenses.

The depreciation deductions claimed on such returns were computed by use of the income forecast method. On the returns, the calculation of the deductions were set forth as follows:

| | 1972 | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|---|
| Current exhibition receipts: | | | | | |
| Cash | $34,901 | $1,397 | $1,920 | $6,049 | $902 |
| Accrued | 14,609 | 4,433 | --- | --- | --- |
| | 49,510 | 5,830 | 1,920 | 6,049 | 902 |
| Total of current and future receipts | 74,500 | 8,330 | 7,820 | 6,367 | 902 |
| Unrecovered basis of film | 2,044,331 | 685,873 | 205,830 | 154,372 | 7,719 |
| Depreciation rate (Ratio of current exhibition receipts to total current and future receipts) | × 66.45% | ×69.99% | × 25% | × 95% | ×100% |
| Depreciation for year | 1,358,458 | 480,043 | 51,458 | 146,653 | 7,719 |

---

[4]The record is bare as to the amount of distribution expenses incurred by Levitt-Pickman in subsequent years.

On their Federal income tax return for 1975, the petitioners claimed a deduction for a loss attributable to the operation of Alpha. Such loss resulted from the depreciation deduction claimed by Alpha in that year. In his notice of deficiency, the Commissioner determined that Alpha was not entitled to such depreciation and disallowed the deduction claimed by the petitioners.

Section 167(a) of the Internal Revenue Code of 1954[5] provides that a taxpayer shall be allowed, as a depreciation deduction, a reasonable allowance for the exhaustion of property used in a trade or business. Depreciation is "an accounting device which recognizes that the physical consumption of a capital asset is a true cost, since the asset is being depleted." *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 10 (1974). "[I]t is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes." *Massey Motors, Inc. v. United States*, 364 U.S. 92, 104 (1960). Because television films typically generate an uneven flow of income, the Commissioner took the position in Rev. Rul. 60–358, 1960–2 C.B. 68, that, in most cases, the time-based methods of depreciation described in section 167(b)[6] are inadequate when applied to such films. The usefulness of a television film in a taxpayer's trade or business is more accurately measured over the stream of income it produces than over the passage of time alone. Consequently, the Commissioner has authorized use of the income forecast method.

In relevant part, Rev. Rul. 60–358 states at pages 68–69:

After an extensive study and consideration of the matter, the Service has concluded that the so-called "income forecast" method is readily adaptable in computing depreciation of the cost of television films without producing any serious distortion of income. This method requires the application of a fraction, the numerator of which is the income from the films for the taxable

---

[5] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue, unless otherwise indicated.

[6] Sec. 167(b) authorizes the use of the straight line method, the double declining balance method, and the sum of the years digits method.

year, and the denominator of which is the forecasted or estimated total income to be derived from the films during their useful life, including estimated income from foreign exhibition or other exploitation of such films. *The term "income" for purposes of computing this fraction means income from the films less the expense of distributing the films, not including depreciation.* This fraction is multiplied by the cost of films which produced income during the taxable year, after appropriate adjustment for estimated salvage value. * * *

If in subsequent years it is found that the income forecast was substantially overestimated or underestimated by reason of circumstances occurring in such subsequent years, an adjustment of the income forecast for such subsequent years may be made. * * *

[Emphasis added.]

By Rev. Rul. 64–273, 1964–2 C.B. 62, the Internal Revenue Service also authorized the use of the income forecast method with respect to motion picture films. The application of such method by the Commissioner has been approved by the Court in a series of cases. *Wildman v. Commissioner*, 78 T.C. 943, 950 (1982); *Siegel v. Commissioner*, 78 T.C. 659, 692 (1982); *Schneider v. Commissioner*, 65 T.C. 18, 32–33 (1975).[7] In 1976, Congress enacted section 280 to provide statutory rules with respect to the depreciation of the production costs of motion picture films and certain other properties produced after 1975. Sec. 210(a), Tax Reform Act of 1976, 90 Stat. 1544. Section 280(b) requires the use of an income forecast method for the depreciation of such properties, and in connection with the enactment of such legislation, Congress observed "Motion pictures are usually depreciated on the 'income forecast' method. (Rev. Rul. 60–358, 1960–2 C.B. 68; Rev. Rul. 64–273, 1964–2 C.B. 62.)" S. Rept. 94–938 (1976), 1976–3 (Vol. 3) C.B. 49, 110.

In most cases involving the distribution of motion picture films, the owner or producer includes in gross income only "net receipts." See *Wildman v. Commissioner, supra*; *Siegel v. Commissioner, supra*; *Schneider v. Commissioner, supra*; see generally R. Kopple & B. Stiglitz, Taxation of the Motion Picture Industry 7–8 (1978). In the typical distribution agreement, the producer grants a license to the distributor to exploit the film. The distributor then sublicenses or leases the

---

[7]*Bizub v. Commissioner*, T.C. Memo. 1983–280; *Perlman v. Commissioner*, T.C. Memo. 1983–166.

film to theatre owners for exhibition. The gross rentals are received by the distributor and includable in his gross income. The distributor passes over to the producer a net producer's share, which represents the gross rentals less the distributor's fee and distribution expenses, and the producer includes in gross income only the net producer's share. *Wildman v. Commissioner, supra; Siegel v. Commissioner, supra.* Thus, in applying the income forecast method, a producer under a typical distribution agreement computes his depreciation deduction on a net producer's share, or net income.

In his motion for partial summary judgment, the Commissioner takes the position that the distribution agreement between Alpha and Levitt-Pickman did not substantially differ from the standard distribution agreement, despite the arrangements with respect to the special account. He argues that because the gross receipts from the exhibition of the film were less than the distribution expenses, Alpha had no right to any of such receipts. On the other hand, the petitioners moved for a partial summary judgment in their favor on the grounds that the gross receipts were includable in the gross income of Alpha, and they urge us to hold, as a matter of law, that they are entitled to apply an income forecast method utilizing such gross receipts in the income forecast fraction. If we deny their motion, the petitioners request, in the alternative, that they be given a trial and an opportunity to prove that their method is a reasonable method for computing the allowable depreciation.

When Alpha filed its return for 1972, it had to select a depreciation method for the film. It could have used the straight line method (sec. 162(b); cf. *Tribune Publishing Co. v. Commissioner*, 52 T.C. 717 (1969), affd. per curiam 451 F.2d 600 (9th Cir. 1971); *Inter-City Television Film Corp. v. Commissioner*, 43 T.C. 270 (1964)), or the income forecast method described in Rev. Rul. 60–358, *supra.* Under the revenue ruling, the numerator and denominator of the income forecast fraction clearly were to consist of actual net income and estimated total net income, respectively. Alpha's professional advisers could not have misunderstood such requirement. Despite that requirement, the partnership elected to use the income forecast method. Now, having failed to compute its deprecia-

tion in accordance with the conditions of the revenue ruling, Alpha wishes to use a method different from both that prescribed by the Commissioner and that it actually used.

In *Siegel v. Commissioner, supra,* the partnership kept its books under the cash method of accounting. However, in reporting its gross income and calculating its depreciation deduction under the income forecast method, the partnership included the net producer's share of the film's exhibition rentals and the amount belonging to the distributor for its expenses, even though such amounts were not actually received by the partnership. The Court rejected the taxpayers' argument that "income" for purposes of the numerator of the income forecast fraction is the gross rentals received by the distributor, whether or not such rentals are includable in the gross income of the owner. We observed that the underlying purpose of the income forecast method is to match income with the expenses incurred in the production of such income. Therefore, we held that the taxpayer must have receipts properly reportable as income under its method of accounting in order to be entitled to a depreciation deduction under the income forecast method. 78 T.C. at 693. Because the partnership had no reportable income in the year in issue, the numerator of the income forecast fraction was zero, and therefore, no depreciation deduction was allowable. 78 T.C. at 693.

Likewise, this Court rejected another attempted variation in the use of the income forecast method in *Wildman v. Commissioner, supra.* The taxpayer in that case conceded that net receipts were to be used in applying the income forecast method but argued that the partnership should be allowed to use the accrual method for computing the net receipts to be used for such purpose even though the partnership used the cash method for reporting its income. The partnership had not actually received any payments from the distributor. Relying on *Siegel,* we held that the partnership was not entitled to a depreciation deduction because it had no reportable income in the year in issue which could be used in the numerator of the income forecast method. 78 T.C. at 951.

In both *Siegel* and *Wildman,* the owners of films elected to compute their depreciation deductions by use of the income

forecast method, but in both cases, they sought to vary the method prescribed in Rev. Rul. 60–358. In both cases, the Court rejected the proposed variation and held that no deduction was allowable. In *Wildman*, the owner then sought to change its election and to compute depreciation by use of a different method. The Court also rejected that claim and held that the owner could not change the method chosen by it without the consent of the Commissioner. The Court said:

> petitioners herein chose a clearly acceptable method (income forecast) but simply used such method improperly. Even the case upon which petitioners rely recognized that once a taxpayer selects an acceptable method of depreciation, he may only change that method with the consent of respondent. [78 T.C. at 952.]

Thus, in both *Wildman* and *Siegel*, we held that since the owners of the films had elected to compute depreciation by use of the income forecast method, they had to use the method as prescribed by the Commissioner.

Moreover, the use of the income forecast method as prescribed by the Commissioner has the advantage of assuring similarity of tax treatment for owners of films. If the owner uses a standard distribution agreement, his depreciation deduction is based on the net income received by him. An owner may distribute his own film or may employ an agent,[8] and in such case he will be treated in a like manner if he is required to compute his depreciation on the basis of his net income.

The petitioners have requested an opportunity to prove that their method is reasonable; yet, they neither used a method consistently nor used the method now urged by them. In 1975, Alpha reported actual cash receipts as gross income and used that amount as the numerator of the income forecast fraction. However, in 1972 through 1974, Alpha reported actual cash receipts as gross income but calculated the numerator under an accrual method, adding accrued (but not yet paid) receipts to only those cash receipts earned during the year. Because Alpha reported income under the cash receipts method, it was

---

[8]See R. Kopple & B. Stiglitz, Taxation of the Motion Picture Industry 6–7 (1978).

clearly improper for Alpha to use accrued receipts in comput-ing its income forecast (*Wildman v. Commissioner*, 78 T.C. at 951), and under no view was the method actually used by Alpha acceptable under the law.

After a review of all the arguments, we have concluded that the petitioners have failed to establish that there is any reason for a trial. Because Alpha elected to use the income forecast method, it was required to use that method as prescribed by the Commissioner in the absence of requesting and securing his approval to change its method. Moreover, Alpha never actually used the method urged by it, and its method was clearly improper. Thus, we hold that, as a matter of law, Alpha was required to use net income in the numerator of the income forecast fraction.[9] There is a question as to whether the gross receipts deposited in the special account constituted gross income received by Alpha, but in view of our conclusion that only net income was to be used in the numerator of the income forecast fraction, and in view of the fact that Alpha had no net income in 1975, we need not decide whether the gross receipts constituted gross income of Alpha. Consequently, on the record before us, we can and do hold that Alpha was entitled to no depreciation deduction for 1975, and we will grant the Commissioner's motion for a partial summary judgment.

*An appropriate order will be issued.*

---

[9]The petitioners argue that even if Alpha was required to use only net income in the fraction, it actually had net income in 1975, and in support of that assertion, the petitioners submitted the affidavit of Morris Engel. However, there are substantial questions as to the weight to be given such affidavit because it did not include the papers with respect to which Mr. Engel attested and because his statements would not constitute admissible testimony. Rule 121(d); *Ruffa v. Johns*, 11 Fed. R. Evid. Serv. 1195 (W.D. Pa. 1982) (affidavit unacceptable under the "best evidence rule"); C. McCormick, Evidence, sec. 233 (2d ed. 1972); see *United States v. Ratliff*, 623 F.2d 1293 (8th Cir. 1980); *Herzog Bldg. Corp. v. Commissioner*, 44 T.C. 694 (1965). Moreover, the yearend balances to which he attested do not establish that the receipts each year exceeded the payments during that year.