MARTIN D. FIFE AND BARBARA J. FIFE, ET AL.,[1]
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 3150–80, 3154–80, 3155–80,    Filed January 4, 1984.
          25463–81, 25603–81, 20922–82.

---

[1]Cases of the following petitioners are consolidated herewith: Isaac H. Friedman and Judith Friedman, deceased, docket Nos. 3154–80 and 25463–81; Harold Rand and Lillian Rand, docket No. 3155–80; Arthur Paturick and Sarah Paturick, docket No. 25603–81; and Martin Fife and Barbara Fife, docket No. 20922–82.

1

*Herman Schwartzman, David Garelick,* and *Howard L. Mann,* for the petitioners.
*Anne Hintermeister,* for the respondent.

OPINION

STERRETT, *Judge*: These six consolidated cases are before the Court on respondent's motion for partial summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure. The issues for decision raised by the motion are (1) whether Jupiter Associates is entitled to depreciation deductions for the taxable years in question under the income forecast method; and (2) in two of the cases (docket Nos. 3150–80 and 3154–80), whether the Jupiter Associates partners are entitled to claim an investment tax credit on a motion picture film that was exhibited in Europe prior to its acquisition by the partnership.

In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency[2] |
|---|---|---|---|
| 3150–80 | Martin D. Fife and Barbara J. Fife | 1973 | $92,837.00 |
| 3154–80 | Isaac H. Friedman and Judith Friedman, deceased | 1973 | 14,999.64 |
| | | 1974 | 18,259.17 |
| | | 1975 | 10,723.57 |
| 3155–80 | Harold Rand and Lillian Rand | 1973 | 919.00 |
| 25463–81 | Isaac Friedman and Judith Friedman, deceased | 1976 | 4,804.00 |
| | | 1977 | 3,163.00 |
| 25603–81 | Arthur Paturick and Sarah Paturick · | 1976 | 3,119.00 |
| | | 1977 | 2,622.00 |

[2]The notices of deficiency were dated Dec. 6, 1979, in docket Nos. 3150–80, 3154–80, and 3155–80; July 9, 1981 in docket Nos. 25463–81 and 25603–81; and June 24, 1982, in docket No. 20922–82.

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency |
|------------|------------|--------------|------------|
| 20922–82 | Martin Fife | 1974 | $159,369.00 |
| | and Barbara Fife | 1975 | 85,624.00 |
| | | 1976 | 100,110.00 |
| | | 1977 | 89,504.00 |

These deficiencies resulted from the disallowance of depreciation deductions and investment tax credits claimed by Jupiter Associates along with certain other adjustments not now before us.

Petitioners Martin D. Fife and his wife, Barbara J. Fife, resided in New York, N.Y., at the time of filing the petitions herein. They timely filed joint Federal income tax returns for the calendar years 1973, 1974, 1975, 1976, and 1977 with the Internal Revenue Service Center, New York, N.Y., and/or Holtsville, N.Y.

Petitioners Isaac H. Friedman and his wife, Judith Friedman (deceased), resided in New York, N.Y., at the time of filing the petitions herein. They timely filed joint Federal income tax returns for the calendar years 1973, 1974, 1975, 1976, and 1977 with the Internal Revenue Service Center, New York, N.Y., and/or Holtsville, N.Y.

Petitioners Harold Rand and his wife, Lillian Rand, resided in New Rochelle, N.Y., at the time of filing the petition herein. They timely filed a joint Federal income tax return for the calendar year 1973 with the Internal Revenue Service Center, New York, N.Y., and/or Holtsville, N.Y.

Petitioners Arthur Paturick and his wife, Sarah Paturick, resided in Harrison, N.Y., at the time of filing the petition herein. They timely filed joint Federal income tax returns for the calendar years 1976 and 1977 with the Internal Revenue Service Center, Holtsville, N.Y.

Each of the six consolidated cases involves a partner in Jupiter Associates, a limited partnership organized under the laws of the State of New York. On December 14, 1973, Jupiter Associates acquired the sole and exclusive right, title, privileges, interest, and ownership to exhibit, distribute, and otherwise exploit the motion picture entitled "La Veuve Couderc" (hereinafter referred to as the picture) in the United States, portions of Canada, and certain other limited areas of the world (hereinafter referred to as the territory). The picture was produced in France by Raymond Danon (a Lira Films and

Pegaso Films co-production), was directed by Pierre Granier Deferre, and starred Simone Signoret and Alain Delon. According to the terms of the purchase agreement, the seller, Continental Film Distributors, Ltd., warranted that the expenses of production of the picture were not less than $2 million.[3]

Although the picture had not been released, distributed, or exhibited in any form or by any media in any part of the territory at the time of the sale, it had been previously exhibited extensively in Europe. The gross box office receipts derived from the exploitation and distribution of the picture outside the territory were $5,450,000 at the time of the purchase by Jupiter Associates.

According to the terms of the purchase agreement, Continental Film Distributors, Ltd., agreed to deliver all of the following materials of the picture to Jupiter Associates on or before December 30, 1973:

(a) One full-length brand new, unused 35 mm color internegative of the Picture in first class condition, together with a complete negative of the sound track of the English version of the Picture, corrected and fully synchronized and containing proper music and effects and complete with English titles and credits.

(b) One brand new, unused interpositive of the clear background for the main and end titles.

(c) Ten (10) press books of the Picture.

(d) Fifty (50) color stills and fifty (50) black and white stills of the Picture.

(e) One complete commercially acceptable release color print of the Picture, in first class condition, cleared through United States Customs.

(f) One color reversal internegative of trailer.

(g) One English optical sound track of trailer.

(h) One complete color print of trailer.

In exchange, Jupiter Associates agreed to pay $1,449,500 for the preprint materials of, and relating to, the picture, $50,000 for the copyrights, and $500 for the release print for an aggregate purchase price of $1,500,000. This amount was payable as follows:

(a) $75,000 by cash or certified check payable upon execution of the agreement,

(b) a negotiable promissory note for $90,000 bearing no interest and due on April 30, 1974,

---

[3]The production budget was 9,275,000 French francs which, under the conversion rate in effect in December of 1973 of 4.5 French francs per U.S. dollar, translated into $2,061,111.

(c) a $1,335,000 nonrecourse note with simple interest at the rate of 6 percent payable only out of (i) 65 percent of the net distribution proceeds derived from exploitation of the picture in the territory by all means and media except television, and (ii) 75 percent of the net distribution proceeds derived from television exploitation of the picture.

For purposes of the agreement, the term "net distribution proceeds" was defined as the moneys actually received by Jupiter Associates from exhibitors, distributors, franchise holders, and the like, less all fees and expenses of exploitation and distribution.

The distribution of the picture in the territory proved to be a commercial flop. The partnership tax returns indicate that Jupiter Associates had the following gross income, depreciation deductions, and ordinary losses during the years in issue:

| Taxable year | Gross income | Depreciation deduction | Ordinary loss claimed |
|---|---|---|---|
| 1973 | --- | $258,673 | $280,959 |
| 1974 | --- | 487,773 | 508,776 |
| 1975 | --- | 289,823 | 295,388 |
| 1976 | --- | 127,911 | 131,321 |
| 1977 | --- | 106,208 | 110,397 |
| Total | --- | 1,270,388 | 1,326,841 |

Jupiter Associates used the cash method of accounting and elected on its returns to use the income forecast method to compute its depreciation deduction. In computing its depreciation deduction, the partnership reported as its gross income the gross income received by the distributor of the picture. This amount became the numerator in the income forecast fraction, the denominator of which was the projected gross income over the film's remaining life. However, while the partnership recognized the distributor's gross revenues as its own for purposes of calculating its depreciation deductions, the gross revenues were not reflected in the "income" schedule of the partnership's Form 1065 due to the fact that the gross revenues and gross expenses were netted out. Since the expenses in each year either equaled or exceeded the gross revenues derived from the distribution of the picture, the result each year was either zero or a loss which the partnership chose not to claim.

In addition, on its partnership tax return for the taxable year 1973, Jupiter Associates reported a basis of $1,472,062

with respect to an investment in new property having a useful life between 5 and 7 years as a distributive share item. Petitioners' distributive shares of the partnership's items during the taxable years in question were as shown on page 7.

In his notices of deficiency, respondent disallowed the losses claimed by petitioners in their entirety because he contended the acquisition of the picture was not an activity entered into for profit within the meaning of section 183, I.R.C. 1954. Alternatively, respondent disallowed the depreciation deductions passed through by Jupiter Associates on the following alternative grounds: (1) The amount of the loan to which the picture is subject cannot be included in the partners' bases because the fair market value of the picture has not been established; or, alternatively, (2) the amount of the nonrecourse loan cannot be added to the depreciable basis of the picture because the loan lacks economic substance; or, alternatively, (3) the method of depreciation employed by Jupiter Associates does not bear a proper relationship to a decline in the picture's usefulness. Respondent also disallowed a part of the partnership loss attributable to legal fees in 1973 and 1974 because he determined that such expenses were either organizational or syndication expenses which are neither deductible nor amortizable. Furthermore, respondent disallowed the investment credit claimed in 1973 because he contended that the property failed to qualify under section 48(k). However, in this motion for partial summary judgment we are concerned only with whether Jupiter Associates correctly computed its depreciation deductions under the income forecast method and whether petitioners (in docket Nos. 3150–80 and 3154–80) are entitled to claim an investment tax credit on the properties acquired by Jupiter Associates relating to the picture.

Section 167(a) provides that a taxpayer shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income. For purposes of this deduction, section 167(b) defines "reasonable allowance" to include an allowance computed under either the straight line method, the declining balance method using a rate no greater than 200 percent of the rate under the straight line method, the sum of the years-digits method, or any consistent method which does not produce a deduction in the first two-thirds of

| Docket No. | Petitioner | Taxable year | Limited partnership interest | Loss claimed | Portion of loss attributable to depreciation | Investment tax credit claimed (1973) |
|---|---|---|---|---|---|---|
| 3150–80 | Martin D. Fife and Barbara J. Fife | 1973 | 38% | $106,764.00 | $98,295.74 | $26,106.00 |
| 3154–80 | Isaac H. Friedman and Judith Friedman, deceased | 1973 1974 1975 | 7.125% | 20,018.33 36,250.29 21,046.40 | 18,430.45 34,753.83 20,649.89 | 4,894.63 |
| 3155–80 | Harold Rand and Lillian Rand | 1973 | 5% | 14,048.00 | 12,933.65 | |
| 25463–81 | Isaac Friedman and Judith Friedman, deceased | 1976 1977 | 7.125% | 9,357.00 7,866.00 | 9,113.66 7,567.32 | |
| 25603–81 | Arthur Paturick and Sarah Paturick | 1976 1977 | 4.75% | 6,238.00 5,244.00 | 6,075.77 5,044.88 | |
| 20922–82 | Martin Fife and Barbara Fife | 1974 1975 1976 1977 | 38% | 193,335.00 112,247.00 49,902.00 41,750.00 | 185,353.74 110,132.74 48,606.18 40,359.04 | |

8

the useful life of the property which exceeds the total deductions allowable under the 200-percent declining balance method. However, because television films typically generate an uneven cash flow of income, the respondent recognized in Rev. Rul. 60–358, 1960–2 C.B. 68, that the methods of depreciation described in section 167(b) are in most cases inadequate when applied to such films. Accordingly, in recognition of the fact that the usefulness of a television film in a taxpayer's trade or business is more accurately measured over the stream of income it produces than the passage of time alone, respondent has accepted the use of the income forecast method. In relevant part, Rev. Rul. 60–358 states at pages 68–69:

> After an extensive study and consideration of the matter, the Service has concluded that the so-called "income forecast" method is readily adaptable in computing depreciation of the cost of television films without producing any serious distortion of income. This method requires the application of a fraction, the numerator of which is the income from the films for the taxable year, and the denominator of which is the forecasted or estimated total income to be derived from the films during their useful life, including estimated income from foreign exhibition or other exploitation of such films. The term "income" for purposes of computing this fraction means income from the films less the expense of distributing the films, not including depreciation. This fraction is multiplied by the cost of films which produced income during the taxable year, after appropriate adjustment for estimated salvage value. * * *

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> If in subsequent years it is found that the income forecast was substantially overestimated or underestimated by reason of circumstances occurring in such subsequent years, an adjustment of the income forecast for such subsequent years may be made. * * *

Respondent subsequently extended the use of the income forecast method to motion picture films in Rev. Rul. 64–273, 1964–2 C.B. 62. Accordingly, there is no dispute whether the income forecast method is a proper method of computing depreciation on the picture. The dispute, rather, revolves around how the numerator and denominator of the fraction used in that method are to be computed.

When a limited partnership elects to use the income forecast method to calculate its allowable depreciation deduction for a motion picture under section 167, it does so by multiplying its basis in the film by a fraction, the numerator of which is the

income from the film properly reportable by the partnership under its method of accounting for the taxable year, and the denominator of which is the forecasted total income to be derived from such film during its useful life. Respondent contends that, since Jupiter Associates is a cash basis taxpayer and actually received no income during the taxable years in question, the numerator of the fraction is zero and, consequently, no depreciation is allowable. Petitioners, on the other hand, assert that utilizing net receipts to compute depreciation on theatrical films under the income forecast method is inappropriate. Instead, petitioners argue that the proper application of the income forecast method should be based on the ratio current gross revenues bear to anticipated gross revenues.

This Court was faced with precisely this issue in our recent decision in *Greene v. Commissioner*, 81 T.C. 132 (1983). In *Greene*, we held that, as a matter of law, depreciation under the income forecast method must be based on net, rather than gross, income. We find our decision in *Greene* dispositive of this issue in the instant case. Accordingly, since Jupiter Associates elected to use the income forecast method and had no net income for the taxable years in question, the partnership is not entitled to any depreciation deductions for such years. Consequently, we will grant respondent's motion for a partial summary judgment with respect to this issue.

The second issue involves the entitlement of petitioners Martin D. Fife and his wife, Barbara J. Fife, and Isaac H. Friedman and his wife, Judith Friedman (deceased), to their distributive shares of an investment tax credit attributable to Jupiter Associates' investment in the picture. On its partnership tax return for the taxable year 1973, Jupiter Associates claimed an investment credit of $1,472,062 in "new" section 38 property having a useful life between 5 and 7 years, which qualified for the investment credit. On their 1973 Federal income tax return, petitioners Martin D. and Barbara J. Fife claimed $559,383 as their share of the partnership's basis in the picture, which resulted in an investment tax credit of $26,106; while petitioners Isaac H. and Judith Friedman claimed $104,885 as their share of that basis, which resulted in an investment tax credit of $4,894.63. In his notices of deficiency, respondent disallowed the credits claimed by both

pairs of petitioners in their entirety on the ground that the property failed to qualify for the credit under section 48(k).

Section 38(a) allows a credit against tax for investments in tangible personal property subject to the allowance for depreciation and having a useful life of 3 years or more. Sec. 48(a). The amount of the credit for the taxable year at issue was equal to 7 percent of the taxpayers' "qualified investment" in section 38 property. Sec. 46(a)(1). Section 46(c), in the form in which it was in effect in 1973, defined the term "qualified investment" as the aggregate of the "applicable percentage" of the basis of each "new section 38 property" and the applicable percentage of the cost of each "used section 38 property," with, however, no more than $50,000 of the cost of used section 38 property taken into account for the year now in question. Sec. 48(c)(2)(A). New section 38 property is section 38 property, the original use of which commences with the taxpayer, while all other section 38 property constitutes used section 38 property. Sec. 48(b) and (c).

Petitioners contend that they are entitled to the investment tax credit available with respect to new motion picture property under the law as it existed in 1973. Respondent, however, contends that petitioners are not entitled to any investment credit for their investment in the picture due to the effect of section 48(k). That section was enacted by sec. 804, Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1591 "in order to clear up the past uncertainty with respect to whether the investment credit was available for motion picture films and, if so, in what amounts." *Siegel v. Commissioner*, 78 T.C. 659, 695 (1982). See Staff of Joint Comm. on Taxation (H.R. 10612, 94th Cong., 2d Sess.), General Explanation of Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 188. As we noted in *Wildman v. Commissioner*, 78 T.C. 943, 956 (1982):

Prior to the Tax Reform Act of 1976, the state of the law with respect to the investment credit as it pertained to films was largely an unsettled affair. Section 48(k) is the congressional promulgation of a comprehensive set of rules designed to clarify this area. * * *

Section 48(k)(1)(A)(i) specifically provides that a credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film "only if such film or tape is new section 38 property." This section was made applicable to the taxable

year in question by section 804(d), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1591, 1596, 1976–3 C.B. (Vol. 1) 72, which states as follows:

(d) Entitlement to Credit.—Paragraph (1) of section 48(k) of the Internal Revenue Code of 1954 (relating to entitlement to credit) shall apply to any motion picture film or video tape placed in service in any taxable year beginning before January 1, 1975.

Accordingly, in enacting section 48(k)(1)(A)(i) it was clearly Congress's intention that, with respect to motion picture property placed in service prior to 1975, only new property should qualify for the investment tax credit. See *Siegel v. Commissioner, supra* at 696.

The regulations promulgated under section 48(k) are particularly helpful in establishing what constitutes new property for purposes of that section. Section 1.48–8(a)(2), Income Tax Regs., provides, in pertinent part, that:

Once a qualified film is placed in service in any medium of exhibition in any geographical area of the world, it becomes used property and no investment credit with respect to the film is available to a taxpayer that acquires the film after that time. * * *

In the instant case, there is no dispute that the picture was exhibited extensively in Europe prior to its purchase by Jupiter Associates on December 14, 1973. It is, therefore, clear that under the regulations the picture did not constitute new section 38 property in the hands of Jupiter Associates. Petitioners, however, contend that the retroactive application in this manner of section 48(k) to their investment in the picture denies them the due process of law to which they are entitled under the Fifth and 14th Amendments to the Constitution because their investment was made in 1973, 3 years prior to the enactment of section 48(k). Moreover, petitioners argue that the definition of "new section 38 property" contained in section 1.48–8(a)(2), Income Tax Regs., should not be applicable to the instant case since (1) Congress gave respondent no authority to promulgate regulations defining terms under section 48(k)(1); and (2) the retroactive application of a regulation under a retroactive act is clearly equally restricted. Finally, petitioners assert that, if the regulation is valid, then an evidentiary trial is necessary to resolve the factual issues

surrounding compliance with the regulation. We will examine each of these contentions individually.

A retroactive statute is not of itself unconstitutional unless it violates the due process clause. *Stockdale v. Insurance Cos.*, 87 U.S. (20 Wall.) 323, 331 (1873). Although taxpayers have often argued that the retroactive application of an income tax statute creates an injustice, in light of the decided cases it is well established that Congress possesses the constitutional power to make an income tax statute retroactive. In point of fact, most provisions of the 1939 and 1954 Codes were made retroactive to the beginning of the taxable years in which they were passed.[4] See 1 J. Mertens, Law of Federal Income Taxation, sec. 4.14.

The test to be applied in determining whether the retroactive application of an income tax statute is unconstitutional is whether "the nature of the tax and the circumstances in which it is laid * * * is so harsh and oppressive as to transgress the constitutional limitation."[5] *Welch v. Henry,* 305 U.S. 134, 147 (1938). We are aware of no Federal income tax statute that has ever been found to be unconstitutional under this test because of its retroactive applicability.

With respect to section 48(k)(1)(A)(i), we begin by noting that this Court held in a previous Memorandum Opinion that the retroactive application of the provision in question to 1975 was not unconstitutional. *Nabakowski v. Commissioner*, T.C. Memo. 1982–743. Similarly, in *Wildman v. Commissioner, supra* at 954–956, we upheld the retroactive application of the U.S. production cost test under section 48(k)(4) to the taxable year 1975.[6] Nevertheless, petitioners argue that those cases are distinguishable from the present case since the motion pictures in those cases were acquired after the taxpayers were put on notice of congressional consideration of the provision

---

[4]The 1954 Code was not enacted until Aug. 16, 1954; however, the income tax provisions thereunder are generally effective with respect to taxable years beginning after Dec. 31, 1953. Sec. 7851(a)(1)(A). Similarly, although the 1939 Code was enacted on Feb. 10, 1939, its provisions are applicable to taxable years beginning after Dec. 31, 1938. Sec. 1, I.R.C. 1939.

[5]Thus, the Supreme Court held in *Welch v. Henry*, 305 U.S. 134 (1938), that a Wisconsin statute enacted in 1935 and imposing a tax on previously exempt dividends received in 1933 did not violate the due process clause of the 14th Amendment.

[6]In *Siegel v. Commissioner*, 78 T.C. 659, 696 (1982), retroactivity was also approved, although the question of constitutionality was not specifically raised. In *Siegel*, we sustained the Commissioner's application of sec. 48(k)(1) to deny an investment credit claimed with respect to a used movie for the calendar year 1974.

enacted as section 48(k) by the issuance on November 12, 1975, of H. Rept. 94-658, 1976-3 C.B. (Vol. 2) 880-890.[7]

Although our holdings in *Nabakowski* and *Wildman* are somewhat distinguishable from the instant case because of the lack of notice and longer period of retroactivity involved herein, we do not believe that these distinguishing factors necessitate a holding for petitioners. For, while it is true that many cases involving constitutional challenges to the application of retroactive legislation have discussed the fact that a taxpayer had actual or constructive notice of a proposed change in the tax laws prior to entering into the transactions in question, a notice requirement has never been imposed with respect to retroactive tax legislation. See *Welch v. Henry*, *supra*.

Furthermore, in the instant case, we are not dealing with the retroactive application of a new tax which imposes taxation on an otherwise taxfree transaction. Rather, we are faced with deciding the availability of a tax credit designed by Congress to stimulate the economy by encouraging capital investment. As we recognized in *Wildman v. Commissioner*, *supra* at 955-956:

> Legislative judgment with respect to the investment credit is to be accorded special weight. Purely a creature of statute, the credit is in the nature of a Government subsidy designed to encourage capital investment. The investment credit has experienced a tumultuous path in its relatively short history. Congress first enacted the investment credit in 1962. Thereafter, it was suspended in 1966, reinstated in 1967, repealed in 1969, resurrected in 1971, enhanced in 1975, and otherwise modified almost every year. See *Zuanich v. Commissioner*, 77 T.C. 428, 452 n. 32 (1981). It is readily apparent the investment credit is prone to frequent changes in Congress' notion of the perceived needs of the economy. As this Court noted: "[it is not] for us * * * to question the wisdom of the restrictions on the investment credit." *Zuanich v. Commissioner*, *supra* at 451.

In addition, it is clear from studying the legislative history of section 48(k) that Congress's intention in enacting the statute was not to change the law but to clarify existing law. Accordingly, it is not at all certain that petitioners would be entitled to the investment tax credit in question even without

---

[7]In its report, the Ways and Means Committee reported favorably on H.R. 10612, which later became the Tax Reform Act of 1976, and recommended its passage by the full House of Representatives.

the enactment of section 48(k). In light of the foregoing, petitioners have simply failed to convince us that the denial of the investment tax credit in the instant case is so "harsh and oppressive" as to necessitate a finding that the retroactive application of section 48(k)(1)(A) violates the due process clause of the Constitution. Accordingly, we hold that the retroactive application of section 48(k)(1)(A) to petitioners in the instant case is not unconstitutional.

Having resolved petitioners' challenge to the constitutionality of the retroactive application of section 48(k), we now turn our attention to the regulations promulgated thereunder. Petitioners contend that respondent lacked the authority to promulgate section 1.48–8(a)(2), Income Tax Regs., which defines a used film as one which has been exhibited anywhere in the world prior to its acquisition by the taxpayer. Specifically, petitioners argue that Congress gave the Secretary of the Treasury authority to promulgate regulations under section 48(k) only with respect (1) to prescribing the time and method of election under section 48(k)(3)(b); (2) to defining "direct production costs" under section 48(k)(5)(C); and (3) to allocating direct production costs under section 48(k)(5)(D). Consequently, petitioners assert that Congress did not give the Secretary the power to define or redefine the word "*new*" by creating substantive categories of property which would be defined as "new" or "used" for purposes of section 48(k). We disagree.

In making their arguments, petitioners have completely ignored section 38(b) which grants the Secretary the power to "prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B." Accordingly, as we previously recognized in *Samis v. Commissioner*, 76 T.C. 609, 619 (1981), the regulations issued under section 48 are issued pursuant to a specific statutory grant of authority under section 38(b) and as such constitute "legislative" regulations.

In general, the Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a); *United States v. Correll*, 389 U.S. 299, 306–307 (1967). It is well settled that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statues." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); accord *Commissioner v. Portland Cement Co. of Utah*, 450 U.S.

156, 169 (1981). Because they constitute contemporaneous constructions by those charged with administration of these statutes, they "should not be overruled except for weighty reasons." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co.*, *supra* at 501. Furthermore, "legislative" regulations, such as the regulations issued under section 48, are entitled to even greater weight than regulations issued pursuant to the general authority granted by Congress under section 7805(a). *Zoltan v. Commissioner*, 79 T.C. 490, 495 n. 11 (1982).

There is thus a strong presumption in favor of the validity of section 1.48–8(a)(2), Income Tax Regs. The presumption is buttressed by a review of the legislative history accompanying section 48(k). In the committee reports accompanying the Tax Reform Act of 1976, both the Senate Finance Committee report and the Joint Committee on Taxation General Explanation of the Tax Reform Act of 1976 define used films as "films shown previously in any market." S. Rept. 94–938, at 187, 1976 U.S. Code Cong. & Adm. News 3618; Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, at 177, 1976–3 C.B. (Vol. 2) at 189. In addition, section 48 has always distinguished between new and used property for purposes of section 38, defining used section 38 property as property which is not constructed or erected by the taxpayer and whose "original use does not commence with the taxpayer." Section 48(b) and (c). It is certainly difficult, if not impossible, to say that the regulation in question is unreasonable or plainly inconsistent with this statutory definition of used property. Accordingly, in light of the fact that the regulation was promulgated under the express authority of Congress under section 38(b) and is clearly consistent with the committee reports accompanying section 48(k) and the statutory definition of used section 38 property under section 48(b) and (c), we find that section 1.48–8(a)(2), Income Tax Regs., is not unreasonable or inconsistent with section 48(k) and is, therefore, valid.

Having made this determination, we now must focus on petitioners' contention that the retroactive application of section 1.48–8(a)(2), Income Tax Regs., to the taxable year 1973 is unconstitutional. In light of our finding that the retroactive application of section 48(k) is not unconstitutional, along with

our holding that the regulation is a "legislative" regulation that is not plainly inconsistent with the statute, we have little difficulty in upholding the retroactive application of section 1.48–8(a)(2), Income Tax Regs.

Normally, the first regulations interpreting a particular code section are retroactive in application. In point of fact, the Supreme Court has questioned whether is is even proper to characterize the relation-back of the first regulation to the effective date of the interpreted Code section as being a retroactive application of the regulation since regulations, if valid, do not alter the statute but merely explain its meaning. *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134–135 (1936); *Helvering v. Reynolds*, 313 U.S. 428, 433 (1941). As the Court stated in *Manhattan General Equipment Co.*:

The statute defines the rights of the taxpayer and fixes the standard by which such rights are to be be measured. The regulation constitutes only a step in the administrative process. it does not, and could not alter the statute. It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand. [297 U.S. at 135.]

Accordingly, we find petitioners' contention that the retroactive application of section 1.48–8(a)(2), Income Tax Regs., is unconstitutional and totally without merit.

Finally, we must address the question of whether the application of section 1.48–8(a)(2), Income Tax Regs., results in the denial of the investment tax credit at issue. There is no question in this case that the picture was exhibited extensively in Europe prior to its sale to Jupiter Associates. However, despite this crucial fact, petitioners contend that an evidentiary trial is necessary to resolve the factual issues surrounding compliance with the regulations. We disagree.

Section 1.48–8(a)(2), Income Tax Regs., provides that "Once a qualified film is placed in service in any medium of exhibition in any geographical area of the world, it becomes used property and no investment credit with respect to the film is available to a taxpayer that acquires the film after that time." The sole exception provided to this general rule is the case "where parts of a film have been sold before the film or any of its parts have been placed in service in any medium of exhibition in any geographical area of the world, each part is

new section 38 property until that part is first laced in service. Sec. 1.48–8(a)(2), Income Tax Regs. Petitioners appear to be arguing that, according to the preceding language, all that is necessary to maintain the "new" property quality of the film for purposes of section 48(k) is for the producer to have begun a plan of exploitation which contemplates geographical segmentation prior to the film's initial exhibition.

We were faced with this precise question in our recent Memorandum Opinion in *Nabakowski v. Commissioner, supra.* The facts in *Nabakowski* were almost identical to those in the instant case. The taxpayers had acquired the exclusive rights to distribute and exploit the motion picture, "Puzzle," in the United States and parts of Canada. The film, "Puzzle," was produced in Europe and had been exhibited extensively there prior to the acquisition of the U.S. and Canadian rights by the taxpayer. In deciding that the exception in section 1.48–8(a)(2), Income Tax Regs., was inapplicable to the taxpayer's situation, we stated:

> This exception does not apply to petitioner's film, however, because he bought his "part" of the film, i.e., the United States and Canadian rights, after the film had been placed in service in another geographical area of the world.

Similarly, petitioners in the instant case purchased their "part" of the picture after it had been placed in service in Europe. We find petitioners' interpretation of the regulation strained and overboard and hold that the exception under the regulation in question is inapplicable to petitioners' case.

We conclude that there is no genuine issue as to any material fact and, for the reasons set forth above, respondent is entitled to a partial summary judgment as a matter of law. Accordingly, respondent's motion for partial summary judgment will be granted.

To reflect the foregoing,

*An appropriate order will be issued.*