DENNIS G. CRUM and CLORA A. CRUM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crum v. Commissioner
Docket No. 31646-81.
United States Tax Court
T.C. Memo 1984-328; 1984 Tax Ct. Memo LEXIS 344; 48 T.C.M. (CCH) 381; T.C.M. (RIA) 84328; June 27, 1984. James R. Luppino, for the petitioners. James M. Eastman, for the respondent. FEATHERSTON
MEMORANDUM OPINION FEATHERSTON, Judge: This case has been assigned to Special Trial Judge Randolph F. Caldwell, Jr., pursuant to section 7456(c), [1] and Rules 180, et seq. Respondent has moved for partial summary judgment with respect to two of the issues in the case. Upon due consideration of the record, the Court agrees with and adopts the opinion of the Special Trial Judge, set forth hereinbelow, disposing of respondent's motion. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This matter is before the Court on respondent's motion for partial summary judgment pursuant to Rule 121. The issues for decision are: 1. Whether Domus IV (Domus), a California limited partnership, *346 is entitled to a depreciation deduction for 1975, 1976, and 1977 under the income forecast method or the straight line method; and 2. Whether petitioners are entitled to claim an investment tax credit for 1975 on a motion picture film in an amount greater than that allowed by respondent. Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1972
$6,104
1973
16,506
1974
3,247
1975
62,796
1976
8,701
1977
18,634
The deficiencies resulted from the disallowance of petitioners' distributive share of Domus' reported losses for the years 1975-1977 which were predicated on claimed depreciation deductions and an investment tax credit, as well as other adjustments not now before us. Petitioners were residents of Fresno, California, at the time the petition was filed. At all material times, petitioners had a 13.6-percent partnership interest in Domus, a California limited partnership. Domus had an 80-percent interest in a joint venture between it and ACQ Corporation (ACQ), a California corporation. On December 15, 1975, ACQ purchased from Cinema Verite a motion picture film titled "Aaron Loves Angela" (the *347 film). According to the terms of the purchase agreement executed by the parties, ACQ paid Cinema Verite with a check in the amount of $170,000, plus a nonrecourse note in the amount of $4,672,000. The sole and exclusive source of payment for the note was from proceeds of the film. On December 15, 1975, Domus purchased the film from ACQ. According to the terms of the purchase agreement executed by the parties, Domus paid ACQ with a check in the amount of $275,000 plus a nonrecourse note in the amount of $4,672,600. The sole and exclusive source of payment for the note was from proceeds of the film. Domus and the joint venture each filed Form 1065 partnership returns during 1975, 1976, and 1977. The 1975 returns were the initial returns filed by both partnerships. All items of income, expense, and credit reported on the joint venture's 1975, 1976, and 1977 returns related to its ownership of the film. On its 1975 return, the joint venture elected to depreciate the film pursuant to the income forecast method. On its 1976 return, the joint venture changed its method of depreciation to the straight line method. The joint venture never sought respondent's consent to change its *348 method of depreciation, nor was consent ever given. The joint venture reported no gross income or any other kind of income on its 1976 and 1977 returns. The first issue is whether Domus may change its method of computing depreciation from the income forecast method to the straight line method. The income forecast method of depreciation is an acceptable method of depreciation.This Court has held in several recent cases that once an acceptable method of depreciation is chosen, the taxpayer cannot change that method without the consent of respondent. Greene v. Commissioner,81 T.C. 132, 137-140 (1983); Wildman v. Commissioner,78 T.C. 943, 952-953 (1982); Mitchell v. Commissioner,42 T.C. 953, 968 (1964). See also sec. 1.167(c)-1(a), Income Tax Regs.
Notwithstanding recent case law and the applicable regulations, petitioners advance two arguments in support of thier position that they be allowed to change depreciation methods. Petitioners' first argument is that the notice of deficiency did not raise as an issue Domus' depreciation method. The notice of deficiency stated that petitioners' income for the taxable years ended December 31, 1975 through *349 December 31, 1977, is increased in each year to reflect petitioners' distributive share of adjustments which have been made to the ordinary net income or loss of Domus. An attached exhibit listed depreciation as one of the adjustments. Therefore, the notice of deficiency did raise depreciation as an issue. Petitioners' second argument is that Wildman and Mitchell are distinguishable from the instant case because those cases involved a change from the income forecast method and the straight line method, respectively, to an accelerated method of depreciation, whereas Domus changed from the income forecast method to the straight line method. Therefore, according to petitioners, the change to the straight line method should be allowed without Commissioner's consent. In two recent cases, [2] this Court has held that the taxpayer may not change from the income forecast method to the straight line method without respondent's consent. On brief, petitioners seek to distinguish these cases on the ground that the taxpayers in Tarricone v. Commissioner,T.C. Memo. 1983-674 and Bizub v. Commissioner,T.C. Memo. 1983-280 did not raise the change in *350 depreciation issue at trial, but rather raised that issue for the first time on brief. Regardless of when the issue was first raised, both decisions considered the taxpayers' arguments and rejected them. Furthermore, our review of Tarricone v. Commissioner,supra, does not indicate that the taxpayer's argument was first raised on brief. In any event, these two cases are dispositive of petitioners' second argument. Petitioners also contend that, although the returns filed by the joint venture for 1976 and 1977 reported no net receipts or taxable income, that does not establish that there were no receipts or taxable income. Petitioners assert that whether or not the joint venture or Domus had net receipts or taxable income is a question of fact to be decided at trial. We disagree with petitioners. Other than their mere assertion, petitioners offered no evidence to contradict the figures reported on the partnership returns. See Waring v. Commissioner,412 F.2d 800, 801 (3d Cir. 1969), affg. a Memorandum *351 Opinion of this Court. There is nothing in the record in the form of counter-affidavits or other "acceptable materials" (Rule 121(d)) that shows that either the joint venture of Domus had "net receipts" derived from exploitation of the film. Accordingly, petitioners have failed to show that there is a genuine issue as to any material fact with respect to this issue. Fife v. Commissioner,82 T.C. 1 (1984); Tarricone v. Commissioner,supra;Greene v. Commissioner,supra.
The second issue concerns whether petitioners are entitled to an investment tax credit in an amount greater than that allowed by respondent in the notice of deficiency. For the taxable year 1975, petitioners claimed that their distributive share of the investment tax credit claimed by Domus with respect to the film was $52,642.Petitioners claimed $26,785 of that amount as a credit on their 1975 return, and claimed the balance of $6,104, $16,506, and $3,247 as carrybacks to 1972, 1973, and 1974, respectively. Respondent contends that petitioners' distributive share of the credit is $1,541.33. This amount is derived from only the $170,000 which ACQ paid *352 Cinema Verite by check for the film; it does not include the nonrecourse note in the amount of $4,672,000. In other words, respondent contends that petitioners' distributive share of the credit is limited to the amount that ACQ was "at risk." Section 48(k)(1) and section 1.48-8(a)(4)(ii), Income Tax Regs., provide that an investment credit is allowable to a taxpayer with respect to any motion picture film only if such film is new section 38 property which is a qualified film, and only to the extent that the taxpayer has an "ownership interest" in such film (i.e., a depreciable interest in at least part of the film).A taxpayer's "ownership interest" in a qualified film is determined on the basis of the taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of such film. Sec. 48(k)(1)(C). The proportionate share of any loss which can be incurred with respect to production costs by a taxpayer is the amount that the taxpayer's capital is at risk. Sec. 1.48-8(a)(4)(i), Income Tax Regs. If a taxpayer's capital is considered at risk under the principles of section 465, the taxpayer's capital will be considered to be at risk under this paragraph. *353 Regardless of whether a taxpayer is at srisk under the principles of section 465, a taxpayer's capital will be considered at risk under this paragraph of the regulation (i.e., sec. 1.48-8(a)(4)(i), Income Tax Regs.) if the taxpayer will suffer the economic loss if the qualified film fails to generate sufficient revenue to cover or repay production costs. Section 465(b) provides that a taxpayer shall be considered at risk for an activity with respect to the amount of money contributed by the taxpayer to the activity and amounts borrowed with respect to such activity. A taxpayer shall be considered at risk with respect to borrowed amounts to the extent that the taxpayer is personally liable for the repayment of such amounts. However, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing. If a partnership has an ownership interest in a qualified film, its credit is apportioned among the partners on the basis of their percentage of capital at risk in the partnership at the time the film was placed in service. Sec. 1.48-8(a)(4)(iv), Income Tax Regs.
If the person who produces and incurs the qualified production *354 costs of a qualified film then sells it, and the purchase price is payable solely out of the proceeds generated from the exhibition of the film, since the producer's capital at risk equals the production costs of the film, the producer is entitled to the investment credit with respect to the film. On the other hand, if as part of the purchase agreement the purchaser pays the producer a sum certain in addition to any amount payable from the proceeds of exhibition, then the purchaser is entitled to the investment credit to the extent that the fixed purchase price does not exceed the qualified United States production costs of the film. Sec. 1.48-8(a)(4)(v), Ex. (3), Income Tax Regs. Finally, if a taxpayer purchases a part of the film before it is placed in service, the purchaser's qualified United States production costs are equal to the lesser of (1) the qualified United States production costs of the seller at the time of the sale or at the time of completion if later, reduced by the amount of any prior purchase, or (2) the fixed purchase price of that part of the film purchased. Sec. 1.48-8(g)(1), Income Tax Regs.
In the instant case, Domus acquired its 80-percent interest in *355 the film from ACQ for $275,000 plus a nonrecourse note. ACQ had acquired the rights to the film from Cinema Verite for $170,000 plus a nonrecourse note. Although the record does not indicate the amount of Cinema Verite's qualified United States production costs, since ACQ was only at risk to the extent of $170,000, ACQ's United States qualified production costs can be no more than $170,000. Similarly, since $170,000 is less than the $275,000 paid by Domus to ACQ, Domus' qualified United States production costs can be no more than $170,000. Sec. 1.48-8(g)(1), Income Tax Regs. Therefore, Domus' qualified investment for purposes of computing the credit is no more than the amount allowed by respondent--$170,000. Using this $170,000 amount, respondent determined that petitioners' share of the investment credit was no more than $1,541.33, computed as follows: $170,000 qualified investment multiplied by 66-2/3 applicable percentage [3] (secs. 46(c)(2) and 48(k)(2)) multiplied by 10-percent credit rate (sec. 1.46-1(g)(2), Income Tax Regs.) multiplied by petitioners' 13.6-percent share. To counter *356 respondent's determination petitioners make two arguments.Petitioners' first argument is that the facts admitted do not establish the amount of Cinema Verite's qualified United States production costs. Although petitioners' argument is correct, it does not affect this issue. As already stated, the purchaser's qualified United States production costs are equal to the lesser of the total qualified United States production costs of the seller or the fixed purchase price of the film. Sec. 1.48-8(g), Income Tax Regs. Since ACQ's fixed purchase price for the film was $170,000, the amount of their qualified production costs can be no more than this amount. Petitioners' second argument is apparently that since section 1.48-8, Income Tax Regs., was not proposed until 1977 and not adopted until April 4, 1979, they are not bound by these regulations. However, petitioners have cited no authority for the proposition that section 1.48-8, Income Tax Regs., does not properly interpret section 48(k). Cf. Fife v. Commissioner,supra.
In short, petitioners have not shown that there is a genuine issue as to any material fact for trial with respect to either of these two issues. *357 Therefore, respondent's motion for partial summary judgment will be granted. An appropriate order will be issued.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
2. See Tarricone v. Commissioner,T.C. Memo. 1983-674; Bizub v. Commissioner,T.C. Memo. 1983-280↩.
3. Petitioners did not elect to use the alternative percentage rate under sec. 48(k)(3)↩.