HARVEY L. SHEID AND RITA SHEID, ET AL., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sheid v. Commissioner
Docket No. 5818-81, 20307-81, 20308-81, 17898-83.
United States Tax Court
T.C. Memo 1985-402; 1985 Tax Ct. Memo LEXIS 235; 50 T.C.M. (CCH) 663; T.C.M. (RIA) 85402; August 7, 1985. *235 Held: Partnership business of owning Film constituted activity engaged in for profit; petitioners may not include face amount of nonrecourse note in basis but may include actual cash outlay; petitioners may depreciate Film pursuant to income forecast method and depreciation determined thereunder; and petitioners are not entitled to investment tax credit with respect to Film. Herbert L. Zuckerman,Robert J. Alter and Felix C. Ziffer, for the petitioners. Raymond J. Farrell and Albert Russo, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in income tax due from petitioners as follows: Petitioner
Docket No.
Year
Deficiency
Harvey L. Sheid and
5818-81
1972
$13,987.00
Rita Sheid
1973
17,958.91
Herbert and Dorothy
5818-81
1972
27,598.47
Quittner
1973
43,648.73
Alfred J. and Elizabeth L.
5818-81
1972
[1] 28,117.24
Traynor
1973
48,993.92
Frederick H. and Susan F.
5818-81
1972
14,198.64
Joseph
1973
22,504.83
Gerald B. and Barbara
5818-81
1972
63,488.55
Cramer
1973
89,735.59
Edwin and Sondra Abramson
5818-81
1972
23,168.59
1973
37,575.75
Estate of Jacob C. Abramson,
5818-81
1972
24,940.33
Deceased, and H. Cecelia
1973
43,429.30
Abramson
Melvin S. and Judith I.
5818-81
1972
26,451.01
Bernhaut
1973
36,178.60
Roy E. and Doris H.
5818-81
1972
28,248.20
Osterstock
1973
53,087.34
David G. Kay
20307-81
1972
14,879.00
1973
25,631.00
Robert J. and Bessie N. Breeden
20308-81
1973
35,684.55
Eli and Esther Shapiro
17898-83
1973
28,550.24
*236 Certain issues in these four cases were severed and consolidated for the purposes of trial, briefing, and opinion. These issues all arise out of activities of a limited partnership, JHE PROPERTY LTD. (JHE), formed pursuant to the laws of the State of New Jersey on August 10, 1972, to acquire, own, and exploit the motion picture "The First Roman" (the Film). The issues for our decision are: (1) whether the partnership constituted an activity engaged in for profit within the meaning of section 183[2] *237 ; and (2) if issue (1) is decided in favor of petitioners, (i) what amount of the nonrecourse note given by the partnership to the seller of the Film, if any, can the partnership include in basis for tax purposes; (ii) whether the partnership is entitled to depreciate the Film pursuant to the income forecast method and, if so, whether the partnership has correctly applied that method; and (iii) whether the Film constituted new section 38 property so that petitioners are entitled to an investment tax credit with respect to it. [3] *238 FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Petitioners Robert J. and Bessie N. Breeden, and Eli and Esther E. Shapiro resided in Michigan when they filed their petitions herein. Petitioner *239 David Kay resided in New York State when his petition was filed. All other petitioners resided in New Jersey at the time they filed their petitions. Except for petitioners Frederick and Susan F. Joseph, the parties stipulated that the notices of deficiency were timely mailed. [4]
JHE was formed by Edwin D. Abramson (Abramson) for purposes of acquiring the Film. He was and is the sole general partner and also owned an interest of 6-2/3 percent and contributed capital to the partnership in the amount of $20,000. The partnership elected to use the accrual method of accounting and filed its returns on the calendar year basis. The ownership interests and capital contributions *240 of those limited partners who are parties in this case are as follows: Percentage of
Amount of Capital
Name
Ownership
Contribution
Harvey L. and Rita Sheid
3-1/3
$10,000
Herbert and Dorothy
6-2/3
20,000
Quittner
Alfred J. and Elizabeth L
6-2/3
20,000
Traynor
Frederick H. and Susan F.
3-1/3
10,000
Joseph
Gerald B. and Barbara
13-1/3
40,000
Cramer
Estate of Jacob C.
6-2/3
20,000
Abramson, Deceased, and
H. Cecelia Abramson
Melvin S. and Judith I.
6-2/3
20,000
Bernhaut
Roy E. and Doris H. Osterstock
6-2/3
20,000
David G. Kay
3-1/3
10,000
Robert J. and Bessie N.
6-2/3
20,000
Breeden
Eli and Esther Shapiro
6-2/3
20,000
Total
70    $210,000
Five other limited partners, not parties to this action, own the remaining 23-1/3 percent of the partnership interests. The partnership received capital contributions from all partners totaling $300,000. Of this $300,000, $280,000 of cash was invested in acquiring the Film on September 12, 1972. The Film is a 98-minute color sound motion picture, filmed in English (although minor characters may have spoken in a foreign language). It was directed by Robert Siodmak and produced in Europe by CCC Filmkunst and Company, GMBH K.G. (CCC), a European film producer. The leading roles are played by Orson Wells, *241 Laurence Harvey, Sylvia Koscina, Honor Blackman, and Robert Hoffman. The sets and costumes used in the Film and the photography are of high quality. The Film was copyrighted in 1969 and had been shown in Europe when acquired by JHE. The Film came to the attention of Mr. Peter Strauss, an executive vice president of Allied Artists (Allied) in late 1971 through a press book furnished by Mr. Armand Rubin, a sales agent for CCC. Allied was a distribution and production company, which during 1971 and 1972 was classified as either the largest of the independent distribution companies or the smallest of the majors. At that time, Allied was both cash poor and product poor. Thus, it was interested in acquiring more film products for distribution in order to assist in absorbing its fixed overhead distribution costs but without depleting its cash reserves whenever possible. One method of accomplishing this goal was to locate and negotiate a film purchase arrangement with a producer for a film Allied desired to distribute and then to locate an investor willing to acquire title to the film and to enter into a distribution agreement with Allied. It was Allied's practice in negotiating the *242 purchase price for a film to attempt to make certain that Allied would recover its out-of-pocket costs, that is, that the "down side" potential would allow for this. Also, in negotiating with foreign producers Allied had to take into account the rule of thumb that revenues from the United States should reimburse the producer for one-half of the production costs. These factors were taken into account by Strauss in negotiating for the Film. As a way of opening negotiations Rubin indicated that the producer wanted several million dollars for the Film, roughly 50 percent of the production costs, and that another major company had made an offer in excess of $1 million. He was informed by Strauss that Allied would not consider paying any sum approximating even $1 million in cash. Rubin requested a preliminary offer and, based solely on the press book, Strauss in 1971 made an offer of $90,000 cash plus 80 percent of the gross proceeds of one prime-time television network sale. [5] Negotiations were thereafter continued in Paris, during which period Strauss had an opportunity to view the Film. Strauss and Rubin reached an oral understanding [6] on a purchase of the United States and Canadian *243 rights to the Film for a price of $1,200,000, payable $280,000 in cash and a nonrecourse note in the amount of $920,000 payable from 20 percent of any proceeds that the distributor might collect (distributor gross). [7] *244 After his screening of the Film and during the course of his negotiations with Rubin, Strauss estimated the "up-side" potential to be approximately five million dollars and that Allied could at worst recover a $280,000 cash investment from its 80 percent share of the distributor gross. The Film is described as a "sandal and sword" type, [8] similar to "David and Bathsheba," "The Robe," "Solomon," and "Hercules." These films typically appeal to mass audiences and are distributed widely for showings at each theater for relatively short periods of time, as distinguished from an "art" film which runs for a long period at a single theater. "Sandal and sword" type films are popular in cycles and some have had large grosses. There had been several successful films of this type in the late 1950's and early 1960's but none between then and 1971-1972. Strauss believed that the cycle time for another series of such films had probably arrived. After negotiating the purchase terms, Strauss returned to the United States to attempt to locate an investor group. It is not clear whether Allied would have purchased the Film itself if *245 an investor group had not materialized. Through mutual acquaintances, Strauss was put in touch with Abramson (who later became the JHE general partner) in order to discuss the formation of an investment group to assume and undertake Allied's tentative purchase understanding and to contract with Allied as the distributor. Strauss presented a packaged investment, a film to be acquired at a specified price with Allied as the distributor. A screening of the Film was arranged in July 1972 for Abramson and his legal advisor, Felix Ziffer. Abramson is a certified public accountant with offices in West Orange, New Jersey. He has specialized in doing accounting work for businesses in the entertainment field and for entertainers. Prior to 1972, he had represented entertainers and authors in connection with film production and distribution matters, had assisted in the production of a film, and had himself worked as a professional musician. Ziffer is an attorney, practicing in New York City and specializing in "leisure time activities" which includes the motion picture industry. Prior to 1972, he had represented several of the major film producers and distributors and many businesses and *246 individuals in business matters pertaining to production and distribution of films. He and Abramson had on occasions represented the same client in specific matters. Ziffer also had represented Abramson personally in motion picture matters. Ziffer had also acquired and produced films for his own account. He knew Allied by reputation and knew Strauss socially. Abramson and Ziffer were favorably impressed with the Film and requested from Strauss an estimate of the Film's potential. Although Abramson had never had any business dealings with Allied, he was influenced by Allied's reputation in the distribution field and was impressed with the fact that it was willing to take on the financial and business burden of marketing this product. Abramson and Ziffer understood that they were being offered a package--that the Film's purchase price had already been negotiated and that Allied was to be the distributor. Abramson and Ziffer relied on information supplied by Strauss, including information that the Film had generated receipts somewhere in the neighborhood of $5 million up to that date in its European showings. By letter dated July 25, 1972, Strauss estimated television sales at $800,000, *247 nontheatrical and Canadian sales at $200,000, and theatrical [9] distribution film rentals at $2,750,000, aggregating $3,750,000. These estimates represented the collective judgment of Strauss and his top staff. They were realistic and unbiased. Abramson was fully justified in relying on this information. In making his decision to purchase the film, Abramson also considered the history og gladiator films going back to the original "Ben Hur" in the 1930's and the later film "Spartacus." He, like Strauss, believed there had always been cycles for "sword and sandal" films and that large amounts of money could be made on a film introduced at the beginning of the cycle. Ziffer and Strauss agreed that the distribution agreement would provide for a sharing by Allied and JHE of distributor gross, rather than the net receipts of the distributor, which was favorable to JHE as the owner of the Film. Under the distribution agreement [10], payments to CCC on the deferred portion of the purchase price were to be made out of JHE's share of the distributor gross. On this basis *248 the estimated revenues of JHE would be approximately $2,000,000, providing a gross profit potential of $800,000 (after payment of the entire purchase price), less the partnership's expenses which were nominal in the years 1972 and 1973. As originally negotiated between Strauss and Rubin, CCC was entitled to 20 percent of the distributor gross or more than one-half of the initial percentage of 35 percent payable to the investors. As a result, Ziffer persuaded Strauss to renegotiate the percentage of the distributor gross payable to CCC, which was reduced to 17-1/2 percent. On this basis, Abramson put together a group of investors, with the partnership formed in August 1972; the United States and Canadian rights to the Film were purchased by JHE on September 12, 1972. [11] *250 Ziffer assisted Abramson in negotiating the details of the closing documents but they did not attempt to negotiate a more favorable price. The distribution agreement with Allied was executed on September 14, 1972. The investors were furnished a confidential memorandum which described the terms of the offering, the purchase price, and the tax consequences. It is indicated that, typically, the investment would appeal *249 to taxpayers in high brackets. There are also some comments among Allied internal documents describing the arrangement as a "tax shelter." However, we do not find that tax benefits represented the sole or predominant objective of either the general or the limited partners. The cash portion of the $1,200,000 purchase price, the sum of $280,000 was paid to CCC [12] *251 out of funds of JHE provided by the investors. The balance was evidenced by a nonnegotiable nonrecourse promissory note in the amount of $920,000, payable solely out of one-half of JHE's gross. However, the note was due in full on September 12, 1987. Simple interest at the rate of 4 percent per annum from September 12, 1972 was also then due. JHE was not accountable for any revenues from the Film until actually collected. A security agreement gave the right to foreclose and sell the Film in Newark, New Jersey, in a commercially reasonable manner on default. Thus if the purchase price was not paid by September 12, 1987, the Film could be reacquired on foreclosure. Under the distribution agreement, Allied was obligated to test market the Film in five markets prior to December 31, 1972. Strauss had no interest in JHE and neither he nor Allied received any compensation from JHE or anyone else in connection with the purchase of the Film. The only way in which Allied could recover its out-of-pocket costs was from its share of distributor gross. The Film progressed through normal distribution channels at Allied and was shown in five test markets during 1972 with disappointing results. JHE's share of revenues generated in 1972 was $206.50. Additional theatrical showings in 1973 generated $80.50 for JHE. On Strauss' recommendation, Abramson for the partnership then decided to market the Film to television. Ziffer prodded and pushed Allied in every reasonable fashion and in fact obtained early in 1974 a $10,000 advance against television revenues which the contract did not require. There was also some hope that interest could be developed in films involving Orson Wells that would be sufficient to merit a re-release of the Film theatrically. Industry experience *252 indicates that approximately one out of ten films is successful, that 60 to 70 percent of theatrical revenues will be received within the first 6 months and such revenues will be exhausted at the end of a year. The initial public reaction to a film, such as the results of the showing of the Film in the five test markets, may have an immediate and major impact on its value, since word as to the results of test marketing tends to travel rapidly through the distribution chain. Hence, a film which is estimated to have substantial value prior to showing may be found upon test marketing to be practically valueless, which is what in fact occurred in this case. The partnership accrued and reported gross receipts from theatrical distribution for the 1972 taxable year in the amount of $206.50 (in addition to $93.06 of interest income), although no moneys were received until a later year. In connection with preparation of the 1972 partnership return, Abramson estimated total gross receipts from theatrical exhibition to be $317.69 based on an estimate made by Strauss in 1973. The partnership calculated depreciation for 1972 by the income forecast method as follows: $206.50 / $317.69 X $1,209,646.01 *253 = $786,269.91 [13]
In addition expenses of $1,050.15 [14] were claimed for 1972. Each petitioner reported his or her respective share of the partnership's distributive loss, which was $787,320.06 for the year. In addition, each petitioner claimed his or her respective share of the investment tax credit. [15] For the 1973 calendar year, the partnership reported gross receipts of $9,874 and interest income of $478.96 for a total of $10,352.96. Deductions were claimed for interest of $5,040.25, for depreciation under the income forecast method of $362,893.80 [16] *254 and other expenses of $673.10. [17] The partnership maintained adequate accounting records. On April 14, 1979, Allied filed a petition under Chapter XI of the Bankruptcy Act. After considerable effort by the partnership, including litigation, the distribution rights to the Film were transferred to Lorimar Distribution International, Inc. (Lorimar) with terms of the distribution agreement revised slightly. Lorimar continued efforts to exploit the Film. ULTIMATE FINDINGS OF FACT JHE and its general partner Abramson acquired the Film with a predominant profit objective at a purchase price and upon terms determined after arm's-length bargaining between unrelated parties. Hence the fair market value of the Film on September 12, 1972 was its purchase price--the sum of $1,200,000 payable $280,000 in cash and $920,000 in the form of a nonrecourse note payable out of revenues. We make no finding as to the value of the transaction on September 12, 1972. [18] "Fair market value" as used herein means that the purchase price was reached by the parties in arm's-length *255 negotiations and reflected their reasonable expectations as of September 12, 1972. OPINION Activity for Profit
The first issue for decision is whether the partnership's business was an activity engaged in for profit within the meaning of section 162. [19] *257 The burden of proof is upon petitioners to demonstrate the necessary profit objective. Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Rule 142(a). In order to constitute a trade or business for purposes of section 162, the activity must be carried on in good faith with the dominant hope and intent of making a profit. Siegel v. Commissioner,78 T.C. 659, 698 (1982). Determination of the profit objective is based upon all of the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In the case of a partnership, the profit issue must be determined at the partnership level on the basis of the activities of the partnership and of the general partners. Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). This does not mean, however, that our inquiry is confined solely to the activities *256 of the partnership, for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such a case, a partnership can rely upon the expertise of third parties * * *. The scope of the relevant inquiry therefore expends to encompass the entirety of such multilayered transactions. [Flowers v. Commissioner,80 T.C. 914, 932 (1983).] See also Fox v. Commissioner,80 T.C. 972, 1008 (1983), affd. by order 742 F.2d 1441 (2d Cir. Jan. 23, 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984). On this issue our decision is conclusively for petitioners. The record is free from doubt. As we have found, in 1972 Allied was an established, nationally recognized producer and distributor of films with established expertise. In arm's-length bargaining, Strauss negotiated with an unrelated agent of an unrelated foreign producer terms for the purchase of the Film, which Strauss on behalf of Allied felt were fair to Allied or to a third party investor if one could be located. Allied's reasons for wishing to conserve its cash and thus look for a third party purchaser were satisfactorily explained. There is no responsible suggestion in the record that Allied was undertaking to market an abusive tax shelter, as apparently respondent believes. [20] Nor is there a shred of evidence to indicate that such activity would have been in Allied's interest. By the time Strauss had completed his verbal negotiations and had obtained at least a moral commitment to a purchase of the Film, Allied had a substantial investment in the form of the time and effort of Strauss and his staff and some out-of-pocket expenses. The only way in which this investment could have been recovered *258 was through the distribution of a successful film since Allied did not receive any cash out of the purchase price. Allied's only interest in finding an investor group to purchase the Film was to obtain with only a minor cash outlay another film to distribute, and distribution of the Film again caused Allied to incur further out-of-pocket costs which it could recoup only out of its share of gross distribution revenues. Respondent seems to have been misled by his overemphasis on the initial offer made by Strauss for the Film which respondent consistently describes as the sum of $90,000, apparently not recalling that in addition Strauss offered to the Film's owner 80 percent of a single prime-time television showing. Moreover, the record is undisputed that this offer was made simply to open the negotiations and was not intended or received as a serious or firm offer for the Film. Neither do we find anything suspicious in the fact that the proposition pur to Abramson was essentially a package--a nonnegotiable purchase price for the Film tied into a distribution agreement with *259 Allied. In fact, at the instance of Abramson and his advisor, the percentage of the distributor gross to be paid to the seller of the Film was decreased from 20 percent to 17-1/2 percent so that JHE would be able to retain at least half of its share of the moneys it was to receive until the promissory note had been paid in full. Abramson also negotiated a very favorable distribution agreement with Allied, a producer and distributor of recognized reputation. This was clearly not a typical abusive tax shelter scenario. A profit objective may be analyzed in relation to the nine factors set out in respondent's section 183 regulations [21], but those factors are not applicable or appropriate for every case. The facts and circumstances remain the primary test. Golanty v. Commissioner,supra;Dunn v. Commissioner,supra at 720. Allied's own analysis and the initial projections furnished by Allied to Abramson were reasonable and were based upon the experience of knowledgeable persons. In our judgment, Abramson had no obligation to obtain a more formal appraisal as respondent argues. He was entitled to rely upon Allied as he did. See Flowers v. Commissioner,supra at 932. We *260 note, of course, that, on the basis of the showing in test markets in 1972 and 1973, Allied concluded that further theatrical exploitation would be fruitless. This too was an informed judgment by an experienced person. Abramson and Ziffer did all that could reasonably be expected of the general partner and his attorney in those circumstances. Petitioners have conclusively established the good faith profit objective of the general partner and thus of the partnership and all limited partners. Respondent argues that a profit motive is negated by the fact that the price of the Film so far exceeded its fair market value as to preclude petitioners from making a profit, relying on our opinion in Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). But respondent fails to recognize that, when a property is purchased as a result of arm's-length bargaining, with neither buyer nor seller being under any compulsion and there being no special circumstances present, the purchase price fixes the fair market value of the article purchased at the time of purchase. The Cartright[22] test has been met. We do not have here a situation such as we found in Bixby v. Commissioner,58 T.C. 757 (1972), *261 where the purchase price did not reflect fair market value. [23] On this record, it is at least open to question whether appraisal testimony has any relevance.[24] It is only on the basis of hindsight, respondent's appraisals [25] and respondent's misinterpretation of the initial Strauss offer that respondent reaches the conclusion that the purchase price grossly exceeded fair market value. We do not think it worthwhile to dwell on that evidence. On issue (1) we hold for petitioners. And having found for petitioners on the profit objective issue, we automatically conclude that petitioners are entitled to the business expense deductions claimed on the JHE returns. Nonrecourse *262 Note
The next issue for our determination is the amount, if any, of the nonrecourse note given by JHE to the seller which can be included in basis for purposes of depreciation. The general rule is that where property is acquired by purchase its cost includes the amount of liabilities assumed, or taken subject to, by the purchaser. Crane v. Commissioner,331 U.S. 1 (1947). The mere fact that the liability is secured only by the asset transferred, and that the purchaser otherwise has no personal liability (i.e., a nonrecourse note), will not alone prevent such liability from being included in the basis of the property. Mayerson v. Commissioner,47 T.C. 340 (1966). However, where the purchase price and the principal amount of the nonrecourse note each unreasonably exceeds the fair market value of the property securing the note, the face amount of the note will not be included in the depreciable basis of the property. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Odend'hal v. Commissioner,80 T.C. 588, 604 (1983), affd. 748 F.2d 908 (4th Cir. 1984), *263 cert. denied 471 U.S.    , 53 USLW 3853 (1985). The note may also be excluded from basis where the likelihood of payment is so uncertain that the note is deemed to be too contingent to be included in basis. Estate of Baron v. Commissioner,83 T.C. 542 (1984), on appeal (2d Cir. March 26, 1985); see also Vastola v. Commissioner,84 T.C. No. 62 (May 21, 1985). Respondent divides his argument into two subparts, whether the note was too contingent to be recognized as of its date in 1972, and whether the debt represented by the note substantially exceeds the Film's fair market value so as to preclude recognition of the note under cases such as Brannen v. Commissioner,supra. We have in effect already disposed of this second alternative since we have found that the fair market value of the Film on its date of purchase was its purchase price. Obviously the note did not exceed the fair market value of the Film. The contingency issue is, however, considerably more difficult. In support of his position on the nonrecourse debt, respondent has directed our attention to the recent opinion in Estate of Baron v. Commissioner,supra. In that case, as here, payment of the nonrecourse debt was to *264 be made solely out of revenues generated by exploitation of the property. In Baron we concluded that revenues were dependent upon public acceptance of the recording, and the stature of the individuals involved did not guarantee public acceptance. In our case also revenue depended upon public acceptance, and the movie industry is probably at least as speculative as the record industry. However, in Baron we undertook to distinguish recordings by individual entertainers whose public recognition was not already established from those "whose stature practically guaranteed" success. 83 T.C. at 551. There is relatively little evidence in this record as to the stature in 1972 of the actors or the director who produced the Film. We are also aware that persons more familiar with the entertainment field then we have been quoted as stating that "there is no guarantee that even a superstar movie maker's next film will be a hit." [26] The parties, Allied and JHE, engaged in a calculated risk--that the time had come for another cycle of "sandal and sword" (or "sword and sandal") movies. They simply misjudged the moviegoing audience at the time, a situation which is not uncommon since as a rule *265 of thumb only one film out of ten is successful. We have no reason to believe that any other combination of actors and directors would have produced a different public attitude toward the Film. As of the Film's purchase date in September 1972 there was no guarantee that it would be successful, and this record lends support for the conclusion that predicting the success of any movie in advance of public showing is highly speculative. Hence we prefer to rest our contingency analysis on decisions such as Gibson Products Co. v. United States,637 F.2d 1041 (5th Cir. 1981); Brountas v. Commissioner,692 F.2d 152 (1st Cir. 1982), cert. denied 462 U.S. 1106 (1983); vacating and remanding on other grounds 73 T.C. 491 (1979); and CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), cert. denied 462 U.S. 1106 (1983), affg. in part, revg. and remanding on other grounds Brountas v. Commissioner,73 T.C. 491 (1979). The contingency issue has arisen in several contexts such as whether the nonrecourse obligation should be added to basis, Inter-City Television Film Corp. v. Commissioner,43 T.C. 270 (1964); *266 whether interest can be accrued and deducted under section 163 by an accrual basis taxpayer, Fox v. Commissioner,supra; and whether the note can be reflected in an expense deduction by a cash basis taxpayer, Saviano v. Commissioner,80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985); Graf v. Commissioner,80 T.C. 944 (1983). No useful purpose will be served here in a review of the facts and reasoning of the numerous decisions which have found an obligation to be too speculative and contingent to be given current tax effect. [27] We conclude here that the nonrecourse $920,000 promissory note was too contingent as of December 31, 1972 and December 31, 1973 to be included in basis. The only somewhat unusual factor here is that, on the date of acquisition of the Film, which of course is also the date of creation of the nonrecourse obligation of $920,000, the Film had a fair market value payable partly in cash and partly with the nonrecourse note. [28] But there is no inconsistency here. A property is worth what parties are willing to pay for it--no more and no less. It is not difficult to conclude that neither Allied nor JHE would have paid $1,200,000 in cash for the Film. Allied *267 and Abramson believed that they would be able to recover their cash outlay. That amount obviously is includable in basis. However, JHE as well as CCC realized that the speculative nature of the movie industry precluded any certainty as to payment of the contingent part of the purchase price. Like CRC Corp. v. Commissioner,supra, unless the activity generated revenue, the nonrecourse obligation would not be paid. Economically, CCC was in some respects a co-venturer with JHE and Allied. Only the theatrical revenues were expected to produce sufficient funds to pay the deferred portion of the purchase price, and the prospect of such revenues was entirely contingent on the reception of the Film by those segments of the movie-going public to which such a film would appeal. In the absence of immediate public acceptance, the Film would have little value. The prospects of revenue from television sales or re-releases after an unsuccessful theatrical release were even more speculative. The Court *268 of Appeals in Gibson very clearly enunciated the factors which must be present in order to treat a nonrecourse obligation as current debt for tax purposes: The principal cases dealing with the problem of nonrecourse loans and taxation have involved situations in which the property securing the nonrecourse note "was real and personal property of a durable nature," which (1) possessed "an objectively ascertainable present value at least equal to the amount of the indebtedness" along with "a reasonably predictable future value * * * reasonably certain to remain at least equal to the amount of indebtedness," and (2) "was relatively immune to or which might be insured against sudden developments [that] might reduce the value of the property below the amount of the unpaid indebtedness." [637 F.2d at 1048.] The common thread which runs through these contingent debt cases is that until the activity has been completed--the well drilled, the book, the song or the movie exposed to the public or the gold recovered from the mine--it is impossible to determine whether or not the activity will produce income which can be applied to retire the indebtedness. In this factual circumstance, it cannot *269 be said that when the nonrecourse obligation is created there is sufficient certainty of its repayment to warrant its inclusion in basis. This is true even though the fair market value of the security equals or exceeds the indebtedness. Fair market value is simply that value which parties dealing at arm's length with equal knowledge of the facts deem the property to be worth. [29] *270 It is a peculiarity of a new film as with any other item of property which depends for its ultimate value on subsequent events that the previously determined fair market value may totally vanish at the moment of the first public showing or it may in those lucky circumstances multiply in value many times. We do not by what we have said here mean to imply a rigid rule for all films until after the results of public showing are known. We simply conclude, on the basis of the evidence before us in this case including the testimony of petitioners' expert on which we place heavy reliance, that under these facts this nonrecourse indebtedness was too contingent to be taken into basis. Depreciation
With respect to the income forecast method of computing depreciation, this case presents two issues--whether any income was received by JHE for purposes of the income forecast method in the year 1972, and if so the denominator to be used in the fraction. The income forecast method of accounting is described in Rev. Rul. 60-358, 1960-2 C.B. 68, as amplified in Rev. Rul. 64-273, 1964-2 C.B. 62. For years involved, taxpayers are not required to use the income forecast method but may elect to use it. However, when they do so, they are required to follow the method as prescribed by respondent. Greene v. Commissioner,81 T.C. 132 (1983). The method is intended to match income and depreciation deductions and no depreciation can be taken in a *271 year in which there is no income. Greene v. Commissioner,supra;Wildman v. Commissioner,78 T.C. 943 (1982). With respect to the first aspect of respondent's argument, respondent contends that the revenues from the five test market showings which took place during December 1972 were not received by Allied until 1973 or thereafter and then distributed to JHE. Respondent also argues that under the terms of the distribution agreement revenues are not required to be taken into account until actually received. Thus, notwithstanding the fact that JHE elected the accrual method, respondent contends that for tax purposes the share of the revenues from the five showings to which JHE is entitled, the sum of $206.50, is not to be treated as accruable in 1972. Respondent cites no authority for its position; we have found none. JHE's share of gross distribution revenues for the year 1972 was $206.50. The partnership's right was not contingent and no facts have been brought to our attention which would cast any doubt, as of the end of 1972, upon the right of JHE to receive those revenues as and when collected by Allied. Under these circumstances JHE was entitled to and required to accrue *272 this income as of December 31, 1972. See Harmont Plaza Inc. v. Commissioner,64 T.C. 632 (1975), affd. 549 F.2d 414 (6th Cir. 1977), cert. denied 434 U.S. 955 (1977). Accordingly, for purposes of the income forecast computation, the numerator of the fraction for the year 1972 is the amount of $206.50. By the same reasoning, the numerator for 1973 is $80.50. Petitioners are entitled to a depreciation deduction in some amount for the years 1972 and 1973 based upon the income forecast method. The remaining question is the denominator of the fraction. For purposes of this calculation, the denominator of the fraction used by petitioners was the sum of $317.69 which was the amount of revenue Strauss estimated in 1973 would be received from theatrical performances of "The Last Roman" during its useful life. This estimate was made in a letter by Strauss to Abramson during 1973 and obviously reflected the poor showing by the Film in December 1972 and in the two additional test markets in 1973. So far as pertinent to this question, respondent's revenue ruling provides as follows: If in subsequent years it is found that the income forecast was substantially overestimated or underestimated *273 by reason of circumstances occurring in such subsequent years, an adjustment of the income forecast for such subsequent years may be made * * *. The total forecast or estimated income to be derived from the films should be based on the conditions known to exist at the end of the period for which the return is made. This estimate can be revised upward or downward, as explained above, at the end of subsequent taxable periods based on additional information which became available after the last prior estimate. [Rev. Rul. 60-358, 1960-2 C.B. 69.] Respondent takes the position that the 1972 income forecast calculations should be made by using as the denominator the Strauss projected total income of $3,750,000 contained in his letter to Abramson dated July 25, 1972. As subissues, respondent argues that: (1) Petitioners have not proven any different figure for the denominator of the fraction, there being no detailed explanation of how the figure of $317.69 was derived; (2) estimated television sales revenues should be included in the denominator; and (3) pursuant to Rev. Rul. 78-28, 1978-1 C.B. 61, the amount of the nonrecourse indebtedness is required to be included in the denominator *274 of the fraction. Focusing upon these arguments in their inverse order, we have held that the nonrecourse indebtedness was too contingent to be included in basis, at least for the 1972 and 1973 years. [30] *275 Accordingly, it is also too contingent to be included in the forecasted income for purposes of the denominator of the fraction. Respondent recognizes that if the nonrecourse note were invalid it should not be included either in basis or in the denominator of the income forecast fraction and we think the rule is equally applicable where we have determined that the obligation is too contingent to be taken into account. The legislative history relative to section 280 and the recent Supreme Court case of Commissioner v. Tufts,461 U.S. 300 (1983), do not mandate a different result. Finally, although a taxpayer electing the income forecast method of depreciation must use the method as specified by respondent, we do not believe that Rev. Rul. 78-28 requires the inclusion of the nonrecourse debt in the denominator, except to the extent that it is included in basis. Under the applicable revenue rulings, the facts to be taken into account for purposes of making the total income forecast estimate are those known to exist "at the end of the period for which the return was made." This would be as of December 31, 1972 with respect to that year. As of that date, Abramson as the general partner for JHE had no knowledge of the success or failure of the Film in the test market showings which took place during the month of December. That information was not communicated to Abramson until the Strauss letter of January 18, 1973. The fact that some of the Allied personnel may have known of the disastrous results of the test markets in December (and the record does not indicate whether or not this is a fact) is immaterial. Obviously the theatres in which the Film was shown were aware of the facts but that knowledge cannot be attributed to JHE. The error in the JHE position is that JHE took into account knowledge acquired as of the date of filing of the 1972 partnership return rather than as of the end of the taxable *276 period. As of December 31, 1972, the only estimate available was that made by Strauss in his letter to Abramson dated July 25, 1972. It is that estimate which must be used for the denominator of the fraction for the year 1972. With respect to the year 1973, however, the facts are different. A downward revision in accordance with Rev. Rul. 60-358 is entirely appropriate. The individual best qualified to make such an estimate was Strauss and, while we do not have any details as to his basis for estimating gross theatrical revenues at $317.69, that is not fatal to petitioners' case. With respect to the viability of that estimate, petitioners at least shifted to respondent the burden of going forward with evidence to show that that estimate was unreasonable. Respondent clearly had that opportunity during his cross-examination of Strauss and failed to do so. The nonrecourse note obligation is not to be taken into account in 1973 as we have already determined for the year 1972. There remains, however, the question of whether the denominator for 1973 is to include some estimate of television and other revenues. The 1973 facts demonstrate that Strauss' July 1972 revenue estimate was *277 grossly inaccurate, not just as to theatricals but in total. As of the end of the year 1973 there was no factual basis for estimating significant revenue from television and other sources. However, by that time Strauss and Allied concluded that television and other revenues would be at least sufficient to warrant the making of an advance of $10,000 to JHE. They were convinced that JHE's share of future television and other revenues would be sufficient for the advance to be recovered. Hence, the advance was made early in 1974. Viewing all the facts together, we conclude that as of December 31, 1973 it was reasonable to estimate that JHE would receive television and other revenues from the Film of $10,000. The denominator of the fraction for 1973 should be the sum of $10,317.69, the sum of estimated theatricals and other revenues. That leaves simply the element of salvage value to determine. JHE apparently estimated salvage value at 5 percent of the cost. This figure has not been challenged by respondent. For both years the formula should be applied to the cost of the Film less 5 percent of the cost. Cost for this purpose is $289,646.01. Investment Credit
The final issue is *278 whether or not the Film constituted new section 38 property for investment credit purposes. Petitioners candidly acknowledged that the law is against them on this issue since the Film had been exhibited in Europe prior to its acquisition by JHE. Fife v. Commissioner,82 T.C. 1 (1984). Petitioners urged us to reconsider Fife which we decline to do. On the basis of Fife, we hold against petitioners because the Film did not constitute new section 38 property. While petitioners argue that at the very least they should be entitled to some used property investment credit, we held in Fife that it was the intention of Congress to limit investment credit to new motion picture films placed in service prior to 1975. We hold for respondent on this issue. Decision will be entered under Rule 155.
Footnotes
1. An addition to tax under section 6651(a) in the amount of $5,154.11 for the year 1972 was determined.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. 3. By Pretrial Order dated September 20, 1983, the common issues in this case were stated to be: (a) Whether the proposed acquisition of the motion picture ever occurred and, if so, the facts relevant to its acquisition; (b) Whether the partnership constituted an activity engaged in for profit within the meaning of section 183; (c) Whether any amounts expended by the partnership are deductible under sections 162 or 212; (d) What amount of the nonrecourse note given by the partnership to the seller of the film, if any, can the partners and partnership include in their bases for tax purposes; (e) Whether the partnership is entitled to depreciate the film; (f) Whether under section 163 the partnership during such years may deduct interest accrued on the nonrecourse note given by the partnership to the seller of the film; and (g) Whether petitioners are entitled to an investment tax credit with respect to the motion picture allegedly purchased by the partnership. Respondent has not argued on brief issue (a) and we deem that the sham argument has been abandoned. In any event, we would find for petitioner on that issue as our opinion on the first issue indicates. Issue (c), to the extent not encompassed by issue (1) above, was not argued by respondent in his trial memorandum, on brief, or during the trial. We conclude that the deductions claimed by JHE on its returns for the years 1972 and 1973 for expenses are conceded by respondent if we find, as we do, that JHE was engaged in its activities for profit. Issue (d) is now argued in the alternative by respondent--that the note was too contingent to be recognized and that since the debt represented by the note substantially exceeded the Film's fair market value as of the date of the transaction, the note cannot be recognized for tax purposes. Issue (e) has been somewhat refined by respondent into issue (2)(iii). Issue (f) is controlled by our resolution of issue (2)(i). Petitioner makes no point about this redefining of the issues as noted in our Pretrial Order.
4. Respondent conceded on the record that the notice of deficiency for the year 1972 issued to petitioners Joseph was untimely. Respondent requests a finding that the notice for the year 1973 was timely but there is no basis in this record for us to make any such finding, although the fact that counsel for petitioners Joseph did not raise the issue of the year 1973 being barred might be viewed as a concession. However, since the statute of limitations question was not included in our Pretrial Order, we decline to decide it.↩
5. There is no estimate in the record as to the possible or probable value of this item. ↩
6. We have used the word "understanding" to reflect the fact that there was no writing exchanged between Strauss and Rubin and we assume neither Allied nor CCC was bound to go forward with the proposed purchase. The record does not indicate whether Rubin was informed of Strauss' intention of attempting to find an investor group to consummate the purchase. However, apparently Rubin and CCC gave Strauss sufficient assurance that CCC would consummate the sale upon the proposed terms within a reasonable period of time. ↩
7. The principal source of film revenue at this time was from movie theater showings. An agreed percentage of the customer revenues generally was retained by the theater and the balance paid to the distributor (distributor gross), from which all other parties were compensated, i.e., in the instant case Allied, JHE, and CCC.
8. Strauss used the term "sandal and sword" while petitioners on brief describe the film as a "sword and sandal" movie.↩
9. Theatrical sales or rentals are the moneys paid by the movie theaters to the distributor of the film. See footnote 7, supra.↩
10. Revenues from the theatrical portion of distributor gross were allocated to JHE as follows: on the first $750,000, 35 percent; on the next $500,000, 40 percent; and on the revenues in excess of $1,250,000, 50 percent. ↩
11. At the beginning of the trial respondent asserted that one document produced at the last minute by petitioners indicated a possible defect in the title of the partnership to the Film. After the trial respondent was allowed to continue to develop facts as to title from overseas sources. On May 16, 1984, the Court heard respondent's Motion to Reopen the Record in order to receive a document the authenticity of which was seriously questioned. At that time respondent represented that several more months of effort would be required for his investigation. After consideration of the entire matter, we declined to reopen the record or to grant respondent further time to discover facts as to the alleged defect in title since after more than 5 months of investigation no single piece of admissible evidence had been produced which cast any shadow on the title of the partnership.
12. To avoid unnecessary confusion we have referred to CCC as the seller of the Film to JHE, although apparently prior to closing, title to the Film had been transferred to an entity known as European Producers and Resources Amstalt. The record does not reveal the facts as to the transfer or as to the connection, if any, between CCC and the actual seller.
13. This formula actually would produce depreciation of $786,275.58. This discrepancy was not noted by the parties. ↩
14. The total is composed of expenses for clerical help, typing, stationery, postage and accounting fees. ↩
15. The Film was characterized as new investment tax credit property with a 3-year useful life. A 10 percent investment tax credit was in effect for the 1972 tax year. ↩
16. The 1973 depreciation deduction does not appear to have been made by the income forecast formula. Instead the deduction represents 30 percent of the cost, petitioners contending that the 1972 deduction represented 65 percent of cost and salvage value equaled 5 percent. 17. The other expenses represented expenses for postage, stationery, accounting fees, screening costs, typing and clerical help.↩
18. See footnote 27, infra.↩
19. Petitioners have argued somewhat interchangeably that JHE was engaged in a trade or business with a profit objective for purposes of sec. 162 and that JHE was engaged in an activity for the production of income under sec. 212. Since the record discloses that JHE, the partnership, was an active entity, we will treat the profit objective issue as arising under sec. 162. See Flowers v. Commissioner,80 T.C. 914, 931↩ n. 23 (1983).
20. The fact that some employees of Allied may internally have referred to JHE as a "tax shelter" is irrelevant.↩
21. Sec. 1.183-2(b), Income Tax Regs.↩
22. United States v. Cartwright,411 U.S. 546↩ (1973). 23. See also Weber v. Commissioner,T.C. Memo. 1983-633↩. 24. Conceivably in some circumstances such testimony may help us to arrive at the conclusion that the purchase price represents fair market value, but where that determination is made independently, appraisal evidence becomes immaterial. ↩
25. Respondent's appraisers were far from impressive. They gave every indication that they were simply performing by rote, in a biased fashion, the task for which they had been employed.↩
26. Landro, "Your Money Matters," Wall St. J., May 20, 1985, purporting to quote Larry Scherger, an entertainment-accounting specialist at Arthur Young & Co.↩
27. Many of the older cases are analyzed in the law review article: Simmons, "Nonrecourse Debt and Basis: Mrs. Crane Where Are You Now?," 53 S. Cal. L. Rev. (Part 1) (1979-80). ↩
28. See page 17, supra.↩
29. It is to be noted that the Film was not worth $1,200,000 in cash on September 12, 1972; rather it was worth $280,000 in cash and a nonrecourse obligation of $920,000. That obligation obviously had value (although perhaps undeterminable). It is incorrect to analyze this transaction as if the parties had consciously inflated a cash purchase price in order to generate tax deductions. There is nothing in this record to indicate that CCC ever considered selling the Film, which it had produced, for a cash price approximating $280,000 or less. This is not a Brannen↩ case.
30. We do not need to decide in this case whether or under what circumstances all or some part of the nonrecourse obligation might be includable in basis. See Simmons, "Nonrecourse Debt and Basis: Mrs. Crane Where Are You Now?," 53 S. Cal. L. Rev. (Part 1) (1979-80) at 50.